UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JOSEPH E. STEVENS,

          Plaintiff,

   v.

JERRY BEARD, et al.,

          Defendants.

Case No. 5:13-cv-03877-EJD

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

Petitioner has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction. Respondent filed an answer on the merits (Dkt. No. 13) and Petitioner filed a traverse (Dkt. No. 15). For the reasons set forth below, the petition for a writ of habeas corpus is GRANTED.

## I.    BACKGROUND

On March 21, 2007, a jury found Petitioner guilty of two counts of murder (Cal. Penal Code § 187) and found true enhancement allegations that Petitioner intentionally discharged a firearm that proximately caused death or great bodily injury (Cal. Penal Code § 12022.53(d)) and the special circumstance of multiple murder (Cal. Penal Code § 190.2(a)(3)). The jury acquitted Petitioner of a third count of murder but found him guilty of the lesser included offense of aggravated assault with a firearm (Cal. Penal Code § 245(a)(2)). On July 13, 2007, the trial court sentenced Petitioner to two life terms without the possibility of parole, two consecutive 25 years to life terms on the firearm enhancements, plus three years for the assault conviction.

On March 9, 2012, the California Court of Appeal, First Appellate District, affirmed the

judgment in an unpublished opinion.  Dkt. No. 13-3.  The California Supreme Court denied review on June 13, 2012.  Dkt. No. 13-4.

Petitioner filed the instant petition on August 22, 2013.  Dkt. No. 1.  However, because petitioner had only initially petitioned for review by the California Supreme Court with respect to his juror misconduct claim but not his evidence spoliation claim, the Court found that he had not fully exhausted his state remedies.  Dkt. No. 9.  The Court held his petition in abeyance and stayed the case pending resolution of all issues by the California Supreme Court.  *Id.*  Petitioner then filed an original habeas petition with the California Supreme Court based on his evidence spoliation claim, and the California Supreme Court summarily denied it on November 24, 2015.  Dkt. Nos. 11, 13-5.  The Court reopened this case on December 3, 2015.  Dkt. No. 12.

## II.    STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> On October 14, 2005, Demae Wysinger and his girlfriend, Jazmanika Ridout, drove from their home to the home of Ridout's aunt so their two-year-old son, Naemon Wysinger, could play with the aunt's grandson. They arrived at the aunt's house less than an hour after sunset. They parked in front of the house and Ridout exited the passenger seat. As she was standing next to the car she heard Wysinger[1] say, "Who's that coming with a Ralo?"[2]
>
> Ridout looked up and saw a man dressed all in black, with a black hoodie pulled up over his head, approaching on foot carrying a long black gun with a drum-style magazine. As the man neared their car he fired at least 18 shots from a .223 caliber semiautomatic firearm into and around the car, killing both Wysinger, who was seated in the driver's seat, and the little boy, who was strapped into a child seat in the rear of the car. The spray of gunfire likely lasted less than 20 seconds. When the shooting began, Ridout dropped to the ground and pulled herself forward to avoid being shot. She was nevertheless hit in the hand, leg, and foot by bullets or metal fragments. The murder weapon was never recovered.
>
> The shooter then ran back in the direction from which he had come (toward Missouri Street) and disappeared. Two other witnesses offered information about a possible getaway car. One neighbor who lived on Missouri Street said he saw a black, dark blue, or dark green Volvo station wagon speeding away shortly after he heard the

---

[1] We refer to Demae Wysinger as "Wysinger" and Naemon Wysinger as "Naemon."
[2] "Ralo" is slang for a gun.

shots fired. Another neighbor on Missouri Street, looking out his window after he heard the shots, saw a dark-skinned African American man, dressed in black and holding a gun, run to a Chevrolet truck or SUV and get into the rear passenger seat before it sped away. He described the suspect to the police as approximately 20 years old, 5 feet 9 inches to 5 feet 11 inches tall, weighing 170 pounds, with a thin build, wearing all black clothes, and carrying a 9 millimeter handgun.[3]

Ridout, who had known defendant from her neighborhood since her early teens, identified him by name as the shooter at the scene[4] and also in an ambulance on the way to the hospital. She picked out his photo at the hospital from a photo lineup and identified him at trial. Ridout described defendant to police as a light skinned black male with freckles, 5 feet 2 inches to 5 feet 3 inches tall, weighing 130 pounds. Despite the poor lighting and hooded sweatshirt, Ridout claimed she could see defendant's eyes, eyebrows, mouth, and nose as he approached the car. She made eye contact with him and recognized him instantly from his face and the way he walked. She was very confident of her identification.

Ridout was unable to put forth a motive for the shooting, since she had long been close friends with defendant in an almost brother-sister relationship. Defendant and Wysinger had also been on friendly terms. The prosecution hypothesized, however, that defendant shot Wysinger to avenge the killing of defendant's girlfriend's brother, who had been killed by Wysinger's stepbrother, Michael Howard, some 20 months earlier.[5]

The defense was mistaken identity. Other immediate eyewitnesses (three of Ridout's cousins), called by the defense, failed to identify defendant or anyone else as the killer, testifying it was too dark to see who did the shooting. A 13-year-old cousin, however, "guessed" the shooter was "probably" 5 feet 9 inches tall. Another 16-year-old cousin, who was located farther from the shooting scene, said the shooter was 5 feet 7 inches to 5 feet 9 inches and "assumed" he was "probably dark skinned" because if he had been light skinned the witness "probably would have seen a little something." The shooter's hood, he testified, came down to his eyebrows. One adult cousin, who was sitting in the doorway of Ridout's residence, estimated the gunman was 5 feet 6 inches to 5 feet 9 inches (including his hood) and weighed 175 pounds. She also testified the shooter's hood came down over his eyes and nose.

The defense also presented an expert witness on perception and memory who testified that even a confident eyewitness identification may be erroneous due to factors such as poor lighting,

---

[3] The prosecution's theory was that this was not the shooter, but an accomplice.

[4] The parties stipulated that none of the police reports mentioned that Ridout had identified defendant at the scene.

[5] Howard and Wysinger were not technically stepbrothers, but Wysinger's father and Howard's mother lived together, so many people considered them brothers or stepbrothers.

Case No.: 5:13-cv-03877-EJD

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

3

distance, brevity of observation, obstacles to vision, the viewer's expectations, and the filling in of memory gaps with postevent information.

Ridout was placed in a witness protection program after the shooting. In one of defendant's jailhouse telephone conversations he made a statement that could be construed as an offer to pay Ridout $10,000 if she failed to appear in court. In a different recorded jailhouse conversation defendant said, "shit if nigga, if that's what they come with nigga [i.e., a plea bargain of six to eight years l, I'm jumpin on it."

Dkt. No. 13-3 at 2-4 (footnotes in original).

## III. DISCUSSION

### A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (20000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the

1    state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d

2    1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63

3    (2003).

4          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

5    the state court identifies the correct governing legal principle from [the Supreme Court's]

6    decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*,

7    529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas

8    court may not issue the writ simply because that court concludes in its independent judgment that

9    the relevant state-court decision applied clearly established federal law erroneously or

10   incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry

11   should ask whether the state court's application of clearly established federal law was "objectively

12   unreasonable." *Id.* at 409. The federal habeas court must presume to be correct any determination

13   of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness

14   by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

15         Here, the California Supreme Court summarily denied Petitioner's petition for review and

16   original state habeas petition. Dkt. Nos. 13-4, 13-5. The California Court of Appeal, however,

17   addressed the claims in the instant petition. Dkt. No. 13-3. The Court of Appeal thus was the

18   highest court to have reviewed Petitioner's claims in a reasoned decision, and accordingly it is the

19   Court of Appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797,

20   803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

21         The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, a federal

22   habeas court must give a heightened level of deference to state court decisions. *See Hardy v.*

23   *Cross*, 565 U.S. 65 (2011) (per curiam); *Harrington v. Richter*, 131 S. Ct. 770, 783-85 (2011);

24   *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal

25   habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings'

26   and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation

27   omitted). With these principles in mind regarding the standard and limited scope of review in

28   Case No.: 5:13-cv-03877-EJD
     ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS
                                                     5

which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claim.

**B.    Claims and Analysis**

Petitioner asserts the following grounds for relief: (1) denial of his rights to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments based on the trial court's decision to not investigate a claim that a juror was racially biased; and (2) denial of his rights to a fair trial, assistance of counsel, and due process under the Fifth, Sixth, and Fourteenth Amendments based on the prosecution's alleged destruction evidence that was relevant to Petitioner's defense.  Both claims were raised in the California Court of Appeal and denied.  Dkt. No. 13-3.  The California Supreme Court summarily denied both Petitioner's petition for review (Dkt. No. 13-4) and petition for a writ of habeas corpus (Dkt. No. 13-5).

**i.    Claim 1: Denial of Fair Trial and Due Process in Not Investigating Claim of Juror Bias**

Petitioner argues that the trial court violated his due process rights and right to a fair trial by failing to investigate claims of a juror's potential racial bias.  The Court of Appeal summarized the relevant procedural background as follows:

> The jury retired to deliberate at lunch time on Tuesday, March 13, 2007.  On the morning of Wednesday, March 14, Juror No.5 expressed discomfort with a comment made by Juror No. 12: "I just want to express a concern.  During deliberations yesterday, juror 12 mentioned, I think inadvertently, that she had discussed the case with her husband.  I expressed my concern at that time and her response is, 'Oh, don't worry about it.  He's a former peace officer' and mentioned to me-to that-he's been in police something and-and mentioned to me we should stop talking about it.  [']It was early in the whole process, so don't worry about it.[']"  The juror questionnaire filled out by Juror No. 12 confirms that her husband is a retired San Francisco deputy sheriff.

> The court then questioned Juror No. 12 in chambers, asking whether she had talked to her husband about the case.  She responded: "No, I only asked him about the auto auction.  That's it.  He won't take any questions."  She further explained, "I asked him the question, I said, 'Can you go to that auto auction,' which I understand that he did not participate in because of this-I said, 'without a driver's license?'  And he said, 'No.' " Her husband then told her "You can't discuss this," and she said, "I know.  I was just curious about the auto auction."  "I just asked if you can walk in without a driver's license

United States District Court
Northern District of California

as a young person and buy an auto if you had money. That's all I asked him." She claimed it would not affect her deliberation. Defense counsel declined to make a motion to remove Juror No. 12.

. . .

On Monday, March 19, four jurors again brought Juror No. 12 to the court's attention. The first was Juror No. 4, who expressed concern that Juror No. 12 may have consulted information not presented in court: "Basically there's four of us who, we were deliberating on Thursday and ... [¶] [Juror No. 12] made reference to remembering, recalling, hearing about the death of the defendant's uncle that was supposedly killed in police custody, on TV. We were like, we stopped. And we're like, she's like, 'It was all over the news. Anybody could have seen it.' So we're like, 'Okay. Like how do you know?' We tried to talk to her a little bit. She kind of clammed up, but we felt like we should say something. I don't know if it's that big of a deal or not." Juror No.4 continued, "She didn't say anything really after that. And she didn't say nothing like, you know, in reference to what she saw on TV. Just that she had seen."

As will be discussed in more detail below, there was uncontroverted evidence that defendant's relative, Aaron Williams, died in police custody following his arrest some years before the current crime.[6]

The same incident was described by Juror No. 2 in the following words: "This is out of an abundance of caution, but during deliberations one of the jurors mentioned that she saw something on TV about Mr. Stevens's Uncle Aaron. And when she said that, we said, 'Okay. Stop right there. We don't want to hear anything more.' So none of us heard, got any information from that, but who knows what, she knows it. It could be absolutely nothing, but we felt that we had to say something." The juror confirmed the event would not affect his or her deliberations, but there was "just a concern of what she knows, and again it could be nothing."

Juror No. 10 also reported the incident, commenting, "I remember her mentioning something and thinking, 'She shouldn't be mentioning that.'"

Juror No. 5 confirmed the others' accounts with additional, and what could be even more troubling, detail: "Well, I guess I would consider it in the larger context, and that's why I'm concerned. [¶] . . . [¶]And so in the larger context, earlier in the week we were having a discussion and out of a very, in a very non sequitur way she started saying something about, this is what she said: 'You can't call these people niggers. They'll just shoot you.' She says that to juror number, I don't know, and I was like, 'What?' We were talking about the language and the culture. [¶]And then Friday [sic] we were

---

[6] In response to defendant's request, we take judicial notice of the fact that Williams died in police custody in 1995, as reported in the news at that time.

talking about Joseph Stevens's uncle who had been shot[7] and he had apparently witnessed or was aware of it, and with a strong conviction she started telling us, 'He's not his uncle. He's not his uncle.' And I was like, she goes, 'Well, you know. There was an article in the newspaper some time back in-' either, one of the jurors quickly said to her, 'Don't say anything more about that.' . . . " Juror No. 5 concluded, "I'm concerned about the bias and the prejudice that's motivating any discussion coming from her. That's my biggest concern."

The court asked each of the remaining jurors individually whether they had heard any of the jurors say they had gained information from outside the trial. Four more said they had. Juror No. 3 said "she said something about a television. About the defendant's uncle something. She didn't say one way, well, actually she sort of did. She said that there was nothing to it and she was kind of immediately hushed down. Like one other juror said, 'I don't think we're supposed to talk about that.' " Juror No. 7 heard Juror No. 12 say something about "having seen something on TV." It wasn't clear whether she saw it "recently [or] remotely." Juror No. 8 also was not "a hundred percent sure of the timing"; it could have been "recent" or "a year or two ago." This juror, too, told the court "those of us that heard her say that basically stopped her and said, 'Don't say anything.' " Juror No. 11, who had been sitting next to Juror No. 12, heard her say "she saw all about" how defendant's uncle got killed "on television ... a while back." Again, the juror said, "'Well let's not talk about it.' And that was pretty much it."

Thus, eight of the jurors heard remarks by Juror No. 12 about defendant's uncle that was received from an outside source. There were no accounts of detailed disclosure. Juror No. 12 was quickly silenced and all of the affected jurors said they could set the remarks aside and base their verdicts on the evidence.

The court next questioned Juror No. 12 about her reference to "Aaron Williams and having seen something on TV." She explained, "That was on TV. That was years ago.[¶] . . . [¶] I think the police department messed up in the way that he died. It was violent. Yes. That's the only thing that I said." She said she would be able to "set aside" any information she had received from television or any other source and base her opinion "simply on what was presented in court."

The court asked Juror No. 12 no questions about the "niggers" remark or about her specific statement that defendant's uncle was "not his uncle." It also did not question any other jurors about either of those remarks.

Defense counsel moved to discharge Juror No. 12. She noted this was the second time the juror had been brought to the court's attention and expressed concern about the juror's statement that

---

[7] There was no evidence that Williams was shot, only that he was "killed" in police custody.

Case No.: 5:13-cv-03877-EJD

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

8

"those people kill each other if they call each other the wrong name or something." She also pointed out the "he's not his uncle" comment. She questioned Juror No. 12's "objectivity," and said the juror appeared to be "making decisions based on things outside the trial," which was counsel's "main concern."

The court took the matter under submission to conduct further research. Deliberations continued on March 20. The court denied the motion to remove Juror No. 12 on Wednesday, March 21, stating that a juror's inability to perform his or her function must be shown "to be a demonstrable reality" and that "wasn't shown."

After the bailiff had received the jury's verdicts, and after the judge had denied the motion, defense counsel reminded the court that Juror No. 12 had used "the 'N' word." The court replied, "she didn't say that. Somebody else said she said that." The judge's ruling did not change. This exchange occurred just before the verdicts were read.

Dkt. No. 13-3 at 4-8 (footnotes in original).

The Court of Appeal rejected Petitioner's due process and fair trial claims. Dkt. No. 13-3.

With respect to the issue of potential racial bias, it reasoned as follows:

The issue of juror misconduct of greatest potential concern is that Juror No. 12 was attributed with making a comment tinged with racial bias: "You can't call these people niggers. They'll just shoot you." Such a statement, standing alone, could imply that Juror No. 12 thought people of other cultures ought to be able to call blacks "niggers" or that she herself had an inclination to call them that. Thus, it could betray in the juror "a state of mind . . . in reference to . . . [one] of the parties" that may have prevented her from acting "with entire impartiality, and without prejudice to the substantial rights" of the defendant. (*Nesler*, *supra*, 16 Cal. 4th at p. 581.)

Defendant argues Juror No. 12's statement was "overtly racist" with no "benign, non-racist way to interpret it." He also argues the juror's use of the term "these people" constituted a racist statement. But the alleged remarks did not appear to attribute a violent disposition to all African Americans, nor did it suggest "these people" are prone to violence because of their race. We are unwilling to construe the remarks as defendant suggests. While it is difficult to justify use of the word "niggers" in any context, such language would only amount to misconduct if it inflamed the other jurors to violate their oaths or if it reflected the juror's own lack of impartiality. We see neither.

Of course, racial epithets have no place in a jury's deliberations if volunteered by a juror as a reflection of his or her own prejudice. The courts have long expressed concern about racist statements that constitute an expression of bigotry by a juror or that might influence other jurors, especially use of the word "nigger." (*Andrews v. Shulsen* (1988) 485 U.S. 919, 920 (opn. of Marshall, J, dis. from

den. of cert.) [napkin with drawing of man on gallows, reading "Hang the Niggers"]; *United States v. Henley* (9th Cir. 2001) 238 F.3d 1111, 1119-1121 (Henley) ["niggers are guilty" and "[a]ll the niggers should hang"].) Verdicts have been overturned for that reason, or cases remanded for further hearings, especially where the juror's comment was specific to a party, linked a racial or ethnic group to criminal tendencies, or was accompanied by other misconduct. (*See United States v. Heller* (11th Cir. 1986) 785 F.2d 1524, 1525-1527 [anti-Semitic and racist comments by jurors]; *Williams v. Price* (3d Cir. 2003) 343 F.3d 223, 227, 233-234, 239 [remand for hearing where juror made racist statements to trial witness after trial]; *State v. Jones* (La. App. 2009) 29 So.3d 533, 535, 540 [conviction reversed where juror used word "nigger" during deliberations]; *State v. Varner* (Minn. 2002) 643 N.W.2d 298, 305 [juror told other jurors a racially insensitive anecdote]; *Powell v. Allstate Ins. Co.* (Fla. 1995) 652 So.2d 354, 357-358 [case remanded for hearing on racial comments by jurors about litigants]; *Jones v. State* (Tex. Crim. App. 1932) 54 S.W.2d 145, 146 [juror called defendant a "bad and dangerous nigger" and related to deliberating jury outside evidence of defendant's misconduct].)

We note, however, that Juror No. 5 did not report the supposedly racist comment when it first occurred. Rather, he or she said it had come up "earlier in the week" preceding the colloquy in which it was reported. In other words, Juror No. 5 waited at least five days to report the allegedly racist remark. This suggests it was not seriously troubling when it occurred. Juror No. 5 was not shy about promptly reporting perceived improprieties: he or she was the juror who reported the first transgression by Juror No. 12, when she consulted her husband about the auto auction, as well as being one of the four who reported the "Uncle Aaron" comments. Having felt comfortable enough to bring forward other forms of suspected misconduct, it is significant to us that Juror No. 5 did not promptly report the allegedly racist comment.

We also find it significant that no other jurors reported the remark, even though each of them had the opportunity to meet privately with the judge and counsel when the "Uncle Aaron" issue came to light. Though the judge did not question the jurors about any racist comments during deliberations or any racial bias they might have perceived among the other jurors, they certainly all had an opportunity to voice concerns about such matters during their individual meetings with the court on March 19. That no other juror reported any such problem suggests to us either that Juror No. 5 was mistaken about the content of the remark or (more likely) that the remark—whatever its exact content—was deemed inoffensive by the other jurors in the context of their deliberations.

Considered in context, Juror No. 12's comment does not appear to be an expression of her own bias or use of an epithet drawn from her own vocabulary. Rather, having been made while discussing "the language and the culture" of defendant and his associates, the remark is most sensibly construed as a reference back to the language used by defendant in the taped jailhouse telephone

conversations.

In one recorded phone call defendant called the person to whom he was speaking "nigga"; his associate on the other call referred to a third party—evidently a mutual friend—as "that nigger." The recorded conversations suggest the word was considered an acceptable way for these individuals to address one another and was not offensive to these young men. Juror No. 12 could have been expressing disapproval of such language, opining that defendant and his friends would not tolerate use of that epithet by those outside their culture. Certainly jurors may refer to or repeat portions of the testimony and comment upon it during deliberations.

There was also testimony about a spate of violent deaths and shootings among the acquaintances of Ridout and Bradley and, inferably, defendant.[8] The comment "they'll just shoot you" appears to have been a reference to the violent milieu in which defendant lived and nothing more sinister. We would not be justified in finding Juror No. 12's remark involved actual bias against African Americans or an attribution of race-based violent tendencies. Given the context described by Juror No. 5, if the words were indeed spoken they most likely amounted to a comment on the evidence and not misconduct. Juror No. 12 appears to have been linking bad language to a propensity for violence.[9] We cannot say belief in such a link is irrational or racist.

Our interpretation is confirmed by that of defense counsel, who moved to discharge the juror in part on the grounds that Juror No. 5 accused Juror No. 12 of saying "those people kill each other if they call each other the wrong name or something." This was undoubtedly a reference to the "niggers" remark, and the judge therefore had that in mind when ruling on the motion to remove Juror No. 12. Moreover, defense counsel's characterization of the incident shows that she, too, considered the reference to "niggers" to relate to name-calling triggering violence, not to Juror No. 12's own racist sentiments.

We are also mindful that inquiry into a juror's racial attitudes in the midst of deliberations is a sensitive matter that arguably threatens the sanctity of the jury's discussions and may even affect the juror's

---

[8] Besides Powell, there was evidence that Wysinger may have had other enemies, including individuals named 'Mikey' or 'Black Mike,' Kedon, and Marvel. The bad blood among these individuals seemed to stem from the earlier killing of Mikey's brother Sean, and Marvel's brother Montrel. Bradley also testified about violence in the community.

[9] Defense counsel was evidently worried that defendant would be viewed in a negative light because of the language he used in his recorded phone calls. On voir dire she asked jurors whether they listen to 'hip hop or rap music,' asking what they 'think about some of the lyrics,' and specifically asking 'if you hear that kind of speech in this trial, would that automatically make you . . . have negative feelings towards the speaker . . .?' She then asked a prospective juror who acknowledged listening to such music, 'sometimes they use words that may appear offensive to some people, and I think you know what word I'm thinking of, hearing that . . . would you hold that against the person that perhaps talks like that?

Case No.: 5:13-cv-03877-EJD
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS
11

continued ability to serve. (*Cf. People v. Lynch* (2010) 50 Cal. 4th 693, 738-740, 743-745, *overruled on other grounds in People v. McKinnon* (2011) 52 Cal. 4th 610 [court's inquiry about juror's use of alcohol so upset juror he became unable to continue deliberations and was removed for cause].) The experienced judge who presided over the trial in this case was in the best position to determine how to handle Juror No. 5's complaint, having spent 20 days taking testimony with the opportunity to observe the jurors' demeanor and interactions. We are loathe to call her reaction an abuse of discretion from our less immediate vantage point.

In *People v. Fuiava* (2012) 53 Cal. 4th 622, our Supreme Court recently recognized that a court inquiring into possible juror misconduct—even without the racial overtones present here—may find itself "between a rock and a hard place" in that it must avoid being "too cursory" while at the same time taking care not to "intrude too deeply into the jury's deliberative process in order to avoid invading the sanctity of the deliberations or creating a coercive effect on those deliberations." (*Id.* at pp. 710-711.) It noted that the course before the court in such circumstances is "fraught with the risk of reversible error at each fork in the road." (*Id.* at p. 710.) Indeed, the extent to which a court may inquire into a juror's racial prejudice has been the subject of some controversy, due to the tension between a defendant's right to a fair trial free of racial bias and the sanctity of the jury's deliberations.[10] (*Compare Henley, supra*, 238 F.3d at pp. 1121-1122 *with United States v. Villar* (1st Cir. 2009) 586 F.3d 76, 83-84.) We believe a more pointed inquiry by the court would have been allowable under California law. (*Cf. People v. Barnwell, supra*, 41 Cal. 4th at p. 1051 [juror predisposed to doubt law enforcement testimony]; *People v. Burgener* (1986) 41 Cal. 3d 505, overruled on other grounds in People v. Reyes (1998) 19 Cal. 4th 743, 753 (Burgener) [juror suspected of smoking marijuana]; *People v. Perez* (1992) 4 Cal. App. 4th 893, 908, fn. 13 (Perez) [California law more liberally allows such evidence than federal law].) Whether the failure to inquire more directly is reversible error is another question.

We would not hesitate to overturn a conviction if we believed it was arrived at by a jury tainted by racial prejudice. But it is also a serious thing to charge an individual with being a racist. We are reluctant to so stigmatize a juror who has had no opportunity to explain or defend her alleged remarks, and we will not assume misconduct where none has been shown. As in *McNeal*, "What [the tainted] [j]uror . . . knew and what she meant by her statements are not a part

---

[10] Defendant relies heavily on *Henley, supra*, 238 F.3d 1111, where a juror had allegedly said, 'niggers are guilty' and '[a]ll the niggers should hang.' (*Id.* at pp. 1113-1114.) But the court in that case did not hold there had been misconduct; it held simply that evidence of racist statements by a juror was admissible 'for the purpose of determining whether the juror's [voir dire] responses were truthful' where the 'juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations . . . .' (*Id.* at p. 1121.) The Ninth Circuit did not reverse the judgment in Henley, but merely remanded the case for further evidentiary development. (*Id.* at p. 1122.)

Case No.: 5:13-cv-03877-EJD
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

12

of the record. We cannot assume that . . . she was guilty of misconduct . . . ." (*McNeal, supra*, 90 Cal. App. 3d at p. 839.)

Although the court's questioning could have been more precisely directed toward discovering evidence of Juror No. 12's possible racism, we do not find the failure to conduct a more piercing inquiry was an abuse of discretion here. The offending comment by Juror No. 12 was a single remark in the context of a long trial and deliberation, reported by only one other juror. Both the defendant and the victims were black. The epithet was not directed at defendant and did not reflect an opinion on the likelihood of his guilt. It appears to have been a comment on the language and culture of a certain segment of the black population. Without more we cannot conclude Juror No. 12 harbored racial prejudice toward African Americans in general or that she allowed such prejudice to affect her verdict. Much less are we convinced that her solitary remark influenced other jurors. Faced with this lack of a clear record, we are unwilling to infer that Juror No. 12's statement reflected actual bias on her part or infected the jury with racism.

Defendant likens his case to *McNeal, supra*, 90 Cal. App. 3d 830 and *Burgener, supra*, 41 Cal. 3d 505. As recited above, in *McNeal* there were clear red flags, not only about the juror's possession of outside information, but about its possible effect on the verdict: the juror reportedly said in deliberations that it "'definitely had a bearing on the way she will vote.'" (*McNeal, supra*, 90 Cal. App. 3d 835.) *McNeal* therefore concluded "the court's failure to make an appropriate inquiry into the facts in order to determine whether they constituted good cause for discharge of the juror constitutes reversible error." (*Id.* at p. 840.) But *McNeal* does not hold that an inadequate inquiry will invariably lead to reversal.

The Supreme Court in *Burgener*, supra, 41 Cal. 3d 505 distinguished *McNeal*, holding the suspected misconduct of a juror did not require reversal where (1) the defense attorney expressed a preference not to question the juror, which may have been a tactical decision; and (2) the record on appeal was insufficient to establish actual juror misconduct. (*Burgener, supra*, at p. 521.)

We follow the rationale of *Burgener* in declining to reverse a conviction where the record does not establish misconduct, but only the possibility of misconduct, and where defense counsel acquiesced in the scope of the court's inquiry. Because the record on appeal in *Burgener* "provide[d] insufficient evidence to evaluate a claim" of juror misconduct, reversal on appeal was inappropriate and a habeas corpus petition was deemed the appropriate remedy. (*Id.* at pp. 521-522.) A similar analysis applies here.

When Juror No. 12's "niggers" comment was specifically brought to the court's attention, it said, "she didn't say that. Somebody else said she said that." This appears to be a finding that Juror No. 5's accusation was not credible, or at least the judge's assessment that Juror No. 12's statement did not amount to misconduct. Since only one juror mentioned the use of this language, though all were

questioned about Juror No. 12's alleged misconduct, the trial court was justified in concluding the remark either was not made or had no effect on the verdict. (*People v. Hamlin* (2009) 170 Cal. App. 4th 1412, 1463.)

Dkt. No. 13-3 at 11-29 (footnotes in original).

In his petition, Petitioner argues that the Court of Appeal's ruling is both contrary to clearly established federal law and also an unreasonable application of it. Dkt. No. 1-1 at 47-50. Petitioner emphasizes that the statement which Juror No. 5 reported that Juror No. 12 made— "You can't call these people niggers. They'll just shoot you."—was not only inherently racist, but also reported alongside a specific expression of concern about Juror No. 12's impartiality. *Id.* at 40-43. Juror No. 5 expressed: "I'm concerned about the bias and the prejudice that's motivating any discussion coming from her. That's my biggest concern." *Id.* Petitioner argues that the totality of these circumstances should have given the trial court sufficient reason to suspect juror bias, and it should have conducted an investigation into this issue. *Id.* at 43-47. By not doing so, Petitioner argues, he was denied due process and his right to trial by an impartial jury. *Id.*

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted). To find a juror impartial, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). "Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Dennis v. United States*, 339 U.S. 162, 171-72 (1950).

The Fifth and Fourteenth Amendments guarantee that no one shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V, XIV. "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith*, 455 U.S. at 217. The safeguards of juror impartiality, such as *voir dire* and protective

instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Id.* "[D]ue process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003); *see also Sims v. Rowland*, 414 F.3d 1148, 1155 (9th Cir. 2005) (Supreme Court cases do not require that a trial court conduct a hearing *sua sponte* whenever presented with allegations of juror bias; court should consider content of allegations, seriousness of the alleged misconduct or bias, and credibility of the source, when determining whether a hearing is required). *Remmer v. United States*, 347 U.S. 227 (1954), and *Smith*, 455 U.S. at 209, do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias. *Smith* states that this "may" be the proper course, and that a hearing "is sufficient" to satisfy due process. *Tracey*, 341 F.3d at 1044 (citing *Smith*, 455 U.S. at 217, 218). *Smith* leaves open the door as to whether a hearing is always required and what else may be "sufficient" to alleviate any due process concerns. *Id.*

Nevertheless, "the Supreme Court has unequivocally and repeatedly held that due process requires a trial judge to endeavor to 'determine the effect' of occurrences tending to prejudice the jury when they happen." *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016), *cert. denied sub nom. Filson v. Tarango*, 137 S. Ct. 1816 (2017) (citing *Smith*, 455 U.S. at 217). As persuasive authority from the Ninth Circuit observes, "the Fourteenth Amendment Due Process Clause forbids a trial judge from remaining idle in the face of evidence indicating probable juror bias." *Sims*, 414 F.3d at 1156. Instead,

> [a] court confronted with a colorable claim of juror bias *must undertake an investigation of the relevant facts and circumstances*. An informal in camera hearing may be adequate for this purpose;

United States District Court
Northern District of California

> due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality. So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.

*Dyer v. Calderon*, 151 F.3d 970, 974-75 (9th Cir. 1998) (citations omitted) (emphasis added).

Only two Supreme Court cases address the questions related to a trial court's constitutional duties when it faces claims of juror bias. First, in *Remmer*, 347 U.S. at 228, a juror was told by an unnamed third party that he could profit by rendering a verdict for the petitioner. The trial court determined, *ex parte*, to not take corrective action and, when defense counsel found out about the incident and requested an evidentiary hearing, the trial court declined. *Id.* The Supreme Court found error, concluding that "[t]he trial court should not decide and take final action *ex parte* . . . but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229-30. Second, in *Smith*, 455 U.S. at 212-13, a juror applied for a job at the District Attorney's Office mid-trial. After trial, the trial court held an evidentiary hearing where both the prosecution and juror testified. *Id.* The Supreme Court held that, even though the hearing occurred post-trial, it was a proceeding "sufficient to decide allegations of juror partiality" and thus satisfied due process. *Id.* at 218.

Applying these standards here, the Court of Appeal's decision is contrary to clearly established federal law in at least two ways. First, unlike *Smith* and like *Remmer*, there was absolutely no effort to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 229-30. After learning from Juror No. 5 about Juror No. 12's racially inflammatory remark, the trial court took no steps to investigate further. *See* Dkt. No. 14 at 2260-72. It did not ask the other jurors if they also heard this comment, nor did it ask Juror No. 12 if she made this comment. *See id.* It also made no effort to investigate whether this comment in particular affected Juror No. 12's ability to be impartial, or whether this comment or the potential racial bias it implies had any impact on deliberations. *See id.* It did not act despite Petitioner's request to remove Juror No. 12 from the jury and his

counsel's specifically expressing the concern that "she's making decisions outside of the evidence that's been brought in this trial." Dkt. No. 14 at 2270. Although the fact that the trial court did not hold a hearing, in and of itself, does not run afoul of clearly established law, its complete failure to conduct any assessment of Juror No. 12's potential racial bias does. *See Remmer*, 347 U.S. at 228 (trial court must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial"); *Smith*, 455 U.S. at 212-13 (trial court conducted hearing "sufficient to decide allegations of juror partiality"); *see also Tarango*, 837 F.3d at 947 ("due process requires a trial judge to endeavor to 'determine the effect' of occurrences tending to prejudice the jury when they happen"); *Sims*, 414 F.3d at 1156 ("the Fourteenth Amendment Due Process Clause forbids a trial judge from remaining idle in the face of evidence indicating probable juror bias"); *Dyer*, 151 F.3d at 974-75 ("[a] court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances").

Second, the trial court did not "preserv[e] . . . [Petitioner's] opportunity to prove actual bias." *Smith*, 455 U.S. at 218. Because the trial court did not make any effort to investigate Juror No. 12's alleged comment, Petitioner was completely foreclosed from being able to make the case that Juror No. 12 was racially biased. Although Petitioner was able to raise the concern of racial bias in his motion to remove Juror No. 12, *see* Dkt. No. 14 at 2269-72, he at that point had no more than the observation of one other juror on which he could base this concern. He had no information from Juror No. 12 herself, nor from any of the other jurors who had had the opportunity to observe her behavior throughout the trial and deliberations. This does not amount to a genuine opportunity to prove actual bias. *Cf. Dennis*, 339 U.S. at 171-72 ("Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.").

In reviewing the trial court's decision, the Court of Appeal did not address either of these principles. Instead, the opinion focused on why, in light of the information that *was* available, the verdict should not be overturned as tainted with racial bias. This skips a step.[11] Before using a

---

[11] Of course, the Court is mindful of the restrictions that procedural posture and appellate review impose. The Court takes no position (nor could it, as the federal habeas court) on the Court of

Case No.: 5:13-cv-03877-EJD
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

collection of information to reach a conclusion about a verdict's constitutionality, it should first be determined that this collection of information is constitutionally adequate—i.e., that the efforts taken to collect it were constitutionally sufficient. The Court of Appeal's own reasoning illustrates the danger of this approach. For example, the Court of Appeal points to the fact that no other jurors reported the remark as a reason for downplaying its significance. Dkt. No. 13-3 at 24. However, this is the product of the trial court's own decision to not investigate the remark: had the trial court asked other jurors about Juror No. 12's comment, other jurors might have reported it as well.[12] As another example, the Court of Appeal devotes a portion of its opinion to hypothesizing over potentially benign reasons for Juror No. 12's remark. *Id.* at 25-26. However, the Court of Appeal was only able to rely on these hypothetical rationales because the trial court did not *actually* ask Juror No. 12 why she made this comment. Thus, as these examples confirm, a trial court's failure to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial," *Remmer*, 347 U.S. at 229-30, critically impairs the ability to determine whether a trial comports with Sixth Amendment and due process requirements.

By not addressing whether the information collected was constitutionally adequate but proceeding to use it to affirm the verdict, the Court of Appeal's decision can only be construed as an implicit determination that the trial court's efforts were constitutionally adequate. For at least the two reasons discussed above, this was not the case. As such, the Court of Appeal's decision is contrary to clearly established federal law.

---

Appeal's direct review of the trial court, and appreciates that the constitutional issues raised here might not have presented themselves in the same manner in the direct review context. Nevertheless, the Court must here determine whether Petitioner "is in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and its analysis proceeds under that limited task.

[12] This same flaw appears in the trial court's reasoning for declining to discharge Juror No. 12. At the hearing on defense counsel's motion, the court noted that Juror No. 12 did not herself admit that she made the racially charged remark. Dkt. No. 14 at 2272 ("[S]he didn't say that. Somebody else said she said that."). This, however, is a product of the trial court's own failure to ask Juror No. 12 if she made this remark. As Petitioner persuasively points out, the trial court had no basis for making this conclusion because it did not ask Juror No. 12 herself whether she made this comment. Dkt. No. 1-1 at 33. It seems unlikely that Juror No. 12 would have separately volunteered this information unprompted.

1    Further, even if the Court of Appeal's decision was not contrary to clearly established

2    federal law, it is at least an unreasonable application of it.  As discussed above, clearly established

3    federal law at a minimum does not permit inaction in the face of potential juror bias.  *See Smith*,

4    455 U.S. at 217 ("[D]ue process only means . . . a trial judge ever watchful to prevent prejudicial

5    occurrences and to determine the effect of such occurrences when they happen."); *Tarango*, 837

6    F.3d at 947 ("[T]he Supreme Court has unequivocally and repeatedly held that due process

7    requires a trial judge to endeavor to 'determine the effect' of occurrences tending to prejudice the

8    jury when they happen.").  This is exactly what happened here: the trial court made no effort to

9    further investigate Juror No. 12's racially charged comment.  *See* Dkt. No. 14 at 2269-72.  No

10   objectively reasonable application of Supreme Court law permits this.

11       The particular circumstances in which the trial court failed to act here strengthen this

12   conclusion.  Before the racially charged comment came to light, concerns had already been raised

13   with respect to Juror No. 12 for two other problematic behaviors: (1) she attempted to discuss the

14   case with her husband, a former peace officer; and (2) she told the other jurors about a news

15   report—which was not introduced at trial—that she had seen about Petitioner's uncle.  Dkt. No.

16   13-3 at 4-8.  Adding the racially charged comment to this collection of problematic behavior, the

17   concern raised by Petitioner's counsel that "she's making decisions outside of the evidence that's

18   been brought in this trial," Dkt. No. 14 at 2270, was significant.  The fact that Juror No. 5 also

19   specifically expressed this concern ("I'm concerned about the bias and the prejudice that's

20   motivating any discussion coming from her. That's my biggest concern.") further strengthens this

21   conclusion.  *See* Dkt. No. 14 at 2262.  Accordingly, because, despite these warning signs, the trial

22   court made absolutely no effort to "determine the circumstances, the impact thereof upon the juror,

23   and whether or not it was prejudicial," *Remmer*, 347 U.S. at 229-30, the Court of Appeal's

24   decision is an unreasonable application of clearly established federal law.

25       Finally, the Court also notes that, although persuasive authority, Ninth Circuit standards

26   also illustrate how the Court of Appeal's decision was an unreasonable application of clearly

27   established federal law.  The Ninth Circuit has

28   Case No.: 5:13-cv-03877-EJD

> interpreted *Smith* and *Remmer* as providing a flexible rule. . . . "[a]n evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source."

*Tracey*, 341 F.3d at 1044 (quoting *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993)).

Here, the content was an inflammatory racial epithet and the alleged misconduct was racial bias. As the Court of Appeal itself observed, such statements and suggestions of racial bias are serious and courts have not been shy to overturn verdicts on these grounds. Dkt. No. 13-3 at 23-24 (collecting cases). Although the exact context of Juror No. 12's alleged statement is unclear, the Court cannot rule out that it was not directed toward Petitioner—it refers to the same type of violence at issue in this case (shooting) and was directed towards "people" of the Petitioner's race. In addition, the source appears reasonably credible. Juror No. 5 also accurately reported the other two instances of misconduct by Juror No. 12 (asking her husband about the auto action and mentioning an external news report about Petitioner's uncle that was not in evidence), and there is nothing in the record that appears to suggest that Juror No. 5 was untrustworthy.[13] Dkt. No. 13-3 at 4-8. Accordingly, the three factors outlined by the Ninth Circuit together weigh in favor of holding a hearing. Although the Court of Appeal's factual determinations are presumed correct, 28 U.S.C. § 2254(e)(1), and this Court declines to independently find the Court of Appeal's conclusion objectively unreasonable under such a fact-intensive rubric, these factors at least also support the Court's conclusion that the Court of Appeal's decision is an unreasonable application of clearly established federal law.

In sum, because the Court of Appeal's decision is contrary to clearly established law (and,

---

[13] In its opinion, the Court of Appeal construed the trial court's "she didn't say that" statement as "a finding that Juror No. 5's accusation was not credible, or at least the judge's assessment that Juror No. 12's statement did not amount to misconduct." Dkt. No. 13-3. This is a factual determination; thus, the Court must presume it is correct and Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner points out that Juror No. 5 had already credibly reported Juror No. 12's two other instances of misconduct. Dkt. No. 1-1 at 45. This is clear and convincing evidence sufficient to rebut the trial court's conclusion. Thus, the Court disagrees with the Court of Appeal and does not deem the trial court to have considered Juror No. 5's accusation not credible.

if not, at least an unreasonable application of it), Petitioner is entitled to habeas relief. The writ is GRANTED.

### ii. Claim 2: Denial of Due Process, Fair Trial, and Ineffective Assistance of Counsel Based on Prosecutorial Misconduct and Destruction of Evidence

Petitioner also argues that he was denied his right to due process and a fair trial because the prosecution destroyed evidence that was relevant to Petitioner's defense and the trial court denied his requests for a corrective instruction or a mistrial. Dkt. No. 1-1 at 53-63. Petitioner further argues that he suffered ineffective assistance of counsel because his attorney failed to raise this spoliation issue in his second trial. Dkt. No. 15 at 13, 15-16. Because the Court has already granted the petition for a writ of habeas corpus based on Petitioner's first claim, the Court need not reach Petitioner's second claim. Nevertheless, to facilitate review, the Court will assess it here.

The Court of Appeal summarized the relevant procedural background as follows:

> During defendant's first trial in May 2006, the defense requested that the jury be allowed to view the crime scene under section 1119. The request was granted and a crime scene visit was scheduled between 8:30p.m. and 9:00p.m. on Monday, May 8, 2006, about one hour after sunset, when the lighting would approximate the lighting at the time of the crime.
>
> Before the viewing, on May 5, 2006, the district attorney handling the trial telephoned Tim Larsen, assistant general counsel of the Housing Authority, to warn him there was "an issue concerning lighting" in the area and that a jury was about to visit the scene. He did not instruct Larsen to repair or replace the lights; he specified the objective was to "emulate the lighting conditions of October 2005," although Larsen did not know what those conditions were.
>
> Larsen immediately set about to fix the lighting problem, ostensibly out of concern for the safety of the judge and jury during their crime scene visit. He sent a crew of six or seven workers to the crime scene to repair all the broken and non-functioning lights.[14] Those workers spent the whole workday on Friday, May 5, replacing light bulbs and repairing light fixtures in the vicinity. They replaced "a lot" of light bulbs, a "bunch" of them, "boxes."
>
> They came back on Monday to finish the job. One 28-watt fluorescent light fixture was replaced with a 52-watt incandescent fixture, but the new fixture did not provide a stronger light.

---

[14] As we read the record, these were lights on the buildings within the housing projects, not streetlights.

On May 8, before the jury's crime scene visit, defense counsel moved for a mistrial due to the lighting fiasco. The district attorney argued: "I simply informed the Housing Authority, I informed the police department to make sure security was out there, that we were bringing the Court out there and our specific goal was to emulate the lighting conditions on October 14, 2005. It was not my intention to change any of the lighting conditions to add light that wasn't there before." Based on the prosecutor's description of his interactions with the Housing Authority, the court concluded there had been no misconduct.

The jury viewed the crime scene on Monday evening, as scheduled. At the direction of the defense, and without objection by the prosecutor, some of the lights were turned off and others were covered to approximate the crime scene lighting. Defense counsel insisted later, however, that additional lights had been weaker or nonfunctional at the time of the shooting.

On May 9, testimony was taken concerning the changes made to the lighting, after which the court denied a renewed mistrial motion. Although it was clear that the lighting in the area had been substantially altered, there was no testimony establishing which lights that had been operational at the time of the crime.

The prosecutor argued "[a]nything that was changed is easily remedied as we did yesterday." "[W]e asked the Defense for their input in terms of which lights they wanted turn[ed] off. We went through their list, turned off every light, and did everything we could to bend over backwards in order to ensure that the scene was what the Defense . . . requested."

The court found there had been no inappropriate conduct by the district attorney, from which we infer a finding of no bad faith on his part. "The Court finds that there's been no tampering or improper behavior on the part of [the prosecutor]. Having been at the scene yesterday and seen certain lights covered at the request of the Defense with no opposition as to anybody as to any lights Defense wanted covered was covered."

The court then reviewed with counsel a DVD of the scene taken on October 14, 2005. Defense counsel claimed the lighting at the scene when the jury was there differed from the lighting at the time of the crime. She focused on three particular lights that she claimed were on when the jury viewed the scene that were not on October 14. The court responded, "And two of those lights three of those lights I saw personally either covered, two of them I saw covered, and one of them I saw being dismantled in one form or another .... "

The court upbraided defense counsel: "[Y]esterday at the scene, your investigator asked for certain lights to be changed. Before we went out there we agreed on what lights would be turned off. 33 was one of the lights you were complaining of. It was turned off. [¶] When we got to the scene, your investigator said two particular

lights need to be covered. Those lights were covered even though one of those lights appeared on the videotape to actually have been on on the day of the event. [¶] So in order to make the location as close to replicating a situation on October 14th, we did what your investigator [asked] . . . so that the scene could be as close to that as [sic] October 14th."

On May 10 defense counsel again moved for a mistrial, which was denied.

On May 11, defense counsel submitted a special jury instruction, which was patterned after CALCRIM No. 306 (Untimely Disclosure of Evidence). The instruction would have told the jury that "all the lighting at this location had been repaired and replaced with higher wattage lighting." It would have further instructed the jury, "[i]n evaluating the weight and significance of that evidence, you may consider the effect, if any of the [district attorney's] failure to disclose" his phone call to the Housing Authority. The special instruction was denied.

The court again stated, "[W]e made the adjustments according to your investigator and at your request and according to whatever was on your list to be turned off we turned off. It was turned off." The lighting was "as close as we could possibly get it to October 14, 2005." As noted above, the first trial ended with a hung jury.

During the second trial defense counsel did not request a crime scene visit. She made no statement indicating she had changed her mind because of the alteration of the lighting in the area, nor did she give any indication that defendant could not receive a fair trial in the absence of a crime scene visit. She made no claim of prosecutorial misconduct during the second trial in relation to the alteration of the lighting. She made no claim that the change in lighting hampered her ability to mount a defense, much less that it had deprived defendant of vital evidence or a 'fair trial.

Several witnesses testified about the poor lighting at the scene. Ridout herself said the lighting was "pretty dim." Other witnesses testified it was "real dark," "dark in the parking lot," and the "lights in the parking lot didn't really work to keep the cul-de-sac lit up." They also noted that some streetlights were not operational. Defendant's expert testified about the negative effect of poor lighting,, and streetlights in particular, in making an accurate identification, and specifically on the loss of color perception and fine details in such lighting.

Defense counsel used the poor lighting in her opening statement, noting that the "lighting is so bad there that after this incident occurred more lights were put in and a higher wattage was put in for liability of the city because they didn't want the city to be liable for any further accidents there." She also emphasized the dim lighting during closing arguments, including showing photographs to the jury to demonstrate that certain lights on the buildings were not lit at the time of the crime.

Case No.: 5:13-cv-03877-EJD
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS
23

Dkt. No. 13-3 at 29-33 (footnote in original).

The Court of Appeal rejected Petitioner's claims for denial of due process, denial of his right to a fair trial, and ineffective assistance of counsel, reasoning as follows:

> Defendant contends the prosecution violated due process and deprived him of his constitutional right to present a defense in violation of the Fifth, Sixth, and Fourteenth Amendments when it ordered or allowed the lighting in the area to be altered, asserting that it effectively destroyed potentially exculpatory evidence.
>
> The Attorney General claims the absence of an objection or motion in the second trial forfeits any right to claim on appeal that the alteration of lighting deprived defendant of his fundamental due process rights. We agree.
>
> The seminal case on evidence preservation is *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), which dealt with the destruction of breath samples after they had been analyzed in drunken driving cases. (*Id.* at p. 481.) There the court said, "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at pp. 488-489.)
>
> The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 (*Youngblood*).) The high court refused to impose "on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (*Id.* at p. 58.) "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Ibid.*) The requirement to show bad faith applies even where the evidence is central to the case and has been requested in discovery. (*Illinois v. Fisher* (2004) 540 U.S. 544, 547-549.)
>
> Of central importance to the court's ruling below was its evident— and oft-repeated—belief that the problem had been remedied by covering and extinguishing some of the lights in accordance with defense instructions so as to replicate the crime scene. Even assuming the lighting at the crime scene "possess[ed] an exculpatory value that was apparent *before* the evidence was destroyed," the first of the *Trombetta* materiality factors—a point that is certainly

debatable[15]—the court's implicit finding that replication of the crime scene was still possible properly disposed of the matter. (*Trombetta, supra*, 467 U.S. at p. 489, italics added.)

The trial court implicitly found the lighting at the crime scene visit constituted "comparable evidence" within the meaning of *Trombetta, supra*, 467 U.S. at p. 489. The court was present at the crime scene and reviewed the crime scene video. We are not in a position to second-guess its finding on such an issue. In reviewing the denial of a *Trombetta* motion, we apply the substantial evidence standard to factual determinations such as the apparent exculpatory value of the evidence that was destroyed, the availability of comparable evidence from other sources, and the absence of bad faith. (*People v. Roybal* (1998) 19 Cal. 4th 481, 510.)

Of course, we would be naïve to ignore the possibility that the prosecutor was motivated by ill purposes when he called to report the unsafe lighting. That lighting conditions at the time of the shooting would prove crucial to the trial was front and center from the outset, being a chief point of contention at the first trial and the second. However, on the present record and in the context of a direct appeal we would uphold the trial court's assessment of good or bad faith if we were to address the issue. The substantial evidence standard applies to a trial court's determination, following a factual inquiry, whether the state acted in bad faith in failing to preserve evidence. (*People v. Memro* (1995) 11 Cal. 4th 786, 831; *People v. Velasco* (2011) 194 Cal. App. 4th 1258, 1262.) The court's implicit finding of no bad faith was supported by substantial evidence in that Larsen testified the district attorney never asked him to change the lighting. More to the point, having failed to renew any objection during the second trial, the defense is precluded from seeking on this appeal the extreme relief proposed—dismissal of the charges—on the basis of a problem that appears to have been curable. Again we emphasize that the changes in lighting, the jury's view of the crime scene, and the defendant's request for a remedial instruction all occurred during the first trial. We review the judgment from the second trial, where none of those issues was raised or ruled upon. The fact that defense counsel did not seek a crime scene visit during the second trial may suggest, as a tactical matter, she did not believe the viewing would aid the defense. It does not inevitably suggest, as defendant seems to believe, that the crime scene had been irremediably altered. The issue has been forfeited.

Dkt. No. 13-3 at 33-35 (footnote in original).

In his petition, Petitioner challenges (1) the trial court's implicit factual finding that the

district attorney did not act in bad faith; (2) the Court of Appeal's determination that Petitioner

_____

[15] Lighting conditions at the crime scene could have aided either the defense or the prosecution depending entirely upon the jurors' assessment of visibility at various distances. It is certainly arguable that such evidence was 'potentially exculpatory' rather than exculpatory on its face, and thus subject to *Youngblood*'s bad faith requirement. (*Youngblood, supra*, 488 U.S. at pp. 57-58.)

was not denied a fair trial; and (3) the Court of Appeal's determination that Petitioner forfeited his prosecutorial misconduct challenge by not raising it during the second trial. Dkt. No. 1-1 at 53-63. Petitioner also argues that, if his spoliation claim was indeed forfeited, he received ineffective assistance of counsel. Dkt. No. 15 at 13, 15-16. The Court begins its analysis with procedural default.

### a. Procedural Default

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine. *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Here, Petitioner's specific theory of procedural default is that his counsel failed to comply with California's contemporaneous objection rule when she failed to renew her objections and jury instruction requests at the second trial. *See* Dkt. No. 13-3 at 35. Petitioner concedes that this noncompliance with the contemporaneous objection rule—and, more generally, procedural default—is an independent and adequate basis upon which the Court of Appeal's decision rests. Dkt. No. 15 at 12 ("The state appellate court did not formally decide Stevens's spoliation claim, because it held that defense counsel forfeited the claim when she didn't renew her objection at the second trial."). Thus, Petitioner's spoliation claim is barred unless Petitioner can show cause and prejudice, or that failure to consider his claim will result in a fundamental miscarriage of justice.

### 1. Cause and Prejudice

The cause standard requires the petitioner to show that "'some objective factor external to

United States District Court
Northern District of California

the defense impeded counsel's efforts' to construct or raise the claim." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v. Carrier*, 477 U.S. at 488). Here, Petitioner points to only one basis for cause: ineffective assistance of counsel. Dkt. No. 15 at 13, 15-16.

A petitioner may show cause by establishing constitutionally ineffective assistance of counsel,[16] but attorney error short of constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a procedural default. *See McCleskey*, 499 U.S. at 494; *Carrier*, 477 U.S. at 486-88.[17] To establish good cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th Cir. 2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). When deciding whether ineffective assistance of counsel constitutes cause for procedural default, AEDPA deference is not given to the state court determination on that claim; ineffectiveness of counsel is decided *de novo* under *Strickland*. *Visciotti v. Martel*, 839 F.3d 845, 865 (9th Cir. 2016).

Applying these principles here, Petitioner's theory of ineffective assistance of counsel fails because he has not satisfied at least the first prong of *Strickland*. In order to show, under this prong, that counsel made errors so serious she was not functioning as "counsel" under the Sixth Amendment (i.e., her performance was constitutionally deficient), a defendant must show that counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688; *see also Bobby v. Van Hook*, 558 U.S. 4, 8-9 (2009) (per curiam) (noting that guidelines, such as those promulgated by the American Bar Association, purporting to establish what reasonable attorneys would do may be helpful but it is not the test for determining whether

---

[16] This is because a defendant has a right to effective assistance of counsel under the Sixth Amendment, and a violation of that must be seen as an external factor, and thus the error must be imputed to the state. *Coleman*, 501 U.S. at 753-54; *Murray*, 477 U.S. at 488.

[17] Counsel's mere failure to recognize the factual or legal basis for a claim, or failure to raise the claim despite recognizing it, does not constitute cause. *See Murray*, 477 U.S. at 486; *Villafuerte v. Stewart*, 111 F.3d 616, 629 (9th Cir. 1997); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996); *see also Engle v. Isaac*, 456 U.S. 107, 130 (1982) (claim of futility of presenting objection to state courts will not constitute cause for failure to object at trial).

Case No.: 5:13-cv-03877-EJD
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

counsel's choices are objectively reasonable).

Here, Petitioner's defense counsel ("Counsel") submitted a declaration stating that

> In preparing for the second trial, I decided not to request permission for the jury to visit the location of the shootings because in my opinion the scene was irretrievably altered and it would not be possible to even come close to approximating the original conditions of the lighting. In addition, I believed that further objections to the destruction of evidence or requests for special instructions to the jury would be futile.

Dkt. No. 13-5 at 75. These explanations confirm that Counsel's performance was not objectively unreasonable. First, her estimation that it would not be possible to approximate the original lighting conditions was not objectively unreasonable. Roughly a year and a half (October 2005 to March 2007) had passed and substantial repairs had been done to the street lights. *See* Dkt. No. 13-3 (summarizing how workers were sent to "repair all the broken and non-functioning lights" and that "[t]hey replaced 'a lot' of light bulbs, a 'bunch' of them, 'boxes'"); Dkt. No. 15-1 at 1556-57 (testimony from Tim Larsen, counsel for the Housing Authority, that the head of maintenance was instructed to "replace . . . [a]ll of the lights that were not functioning"); *see also* Dkt. No. 13-8 at 31-44 (Counsel's motion for a mistrial from the first trial). Reasonable minds could have concluded that it would not have been possible to approximate the lighting conditions at the time of the crime. Moreover, her decision to not visit the location was tactical—her explanation suggests that she determined that Petitioner had a better chance of success if she did not attempt a site visit. "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997). For this reason as well, Counsel's decision to not attempt a site visit during the second trial does not render her representation deficient.

Second, Counsel's decision to not renew her objections or requests for jury instructions at the second trial—although the genesis of Petitioner's procedural default—was not objectively unreasonable. Counsel states that she believed that repeating these objections and requests would have been futile. Dkt. No. 13-5 at p. 75. Under the circumstances, this was not an objectively unreasonable conclusion to reach. The trial judge rejected these requests several times in the first

1   trial, and the second trial did not substantially differ from the first. The issues were the same, the

2   evidence was the same, and trial judge was the same. As such, it was not objectively unreasonable

3   to conclude that the same objections and requests would have yielded the same results here, such

4   that further objection would be futile. *Cf. Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the

5   failure to take futile action can never be deficient performance"). Accordingly, Counsel's failure

6   to object at the second trial does not render her performance deficient under *Strickland*.

7           In his briefing, Petitioner also raises the issue of futility, arguing that, if it would have been

8   futile for Counsel to renew her objections at the second trial, the Court of Appeal should not have

9   found that he procedurally defaulted his claim because "[t]he law does not require the doing of a

10  futile act," *Ohio v. Roberts*, 448 U.S. 56, 74 (1980). Dkt. No. 15 at 12. While it is true that

11  futility is traditionally an exception to California's contemporaneous objection rule, *see People v.*

12  *Welch*, 5 Cal. 4th 228, 237-38 (1993), this argument cannot save Petitioner's claim for habeas

13  relief. This argument challenges the underlying merits of the Court of Appeal's procedural default

14  decision. As such, it asks this Court to directly review a state court's determination of a state law

15  issue which—as Petitioner has already conceded—is independent and adequate. This the Court

16  cannot do. *See Coleman*, 501 U.S. at 729-30. If Petitioner believed that futility would have

17  protected him from procedural default, he should have made this argument to the state court.[18] At

18  this point, the state court's determination that there was procedural default must stand as an

19  independent and adequate ground supporting its judgment, and bars Petitioner's habeas claim

20  here.

21          In sum, Counsel's decisions were not objectively unreasonable, and, as such, do not meet

22  the bar for deficient performance under the first prong of *Strickland*. Petitioner's only theory of

23  cause, ineffective assistance of counsel, fails for this reason. Because Petitioner advances no other

24  theory of cause, Petitioner has failed to show cause and prejudice that would permit this Court to

25  _____

26  [18] Petitioner first had the opportunity to do so when he petitioned for review of the Court of
    Appeal's decision by the California Supreme Court. Dkt. No. 13-4. He did not challenge the
27  spoliation issue and did not raise this argument. *Id.* Petitioner then had the opportunity to make
    this argument when he filed his state habeas petition based on his spoliation claim. Dkt. No. 11.
28  Case No.: 5:13-cv-03877-EJD
    ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

review his procedurally defaulted claim.

### 2. Miscarriage of Justice

If a state prisoner cannot meet the cause and prejudice standard, a federal court may still hear the merits of the successive, abusive, procedurally defaulted or untimely claims if the failure to hear the claims would constitute a "miscarriage of justice." *See McQuiggin v. Perkins*, 569 U.S. 383, 391-92 (2013). The Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray*, 477 U.S. at 496).

Petitioner does not contend that he falls within the miscarriage of justice exception. In addition, Petitioner does not specifically assert that he is actually innocent, nor has he introduced any factual basis that would support his conclusion. Accordingly, his procedural default cannot be excused under this exception.

### 3. Conclusion

Because Petitioner has procedurally defaulted his spoliation claim and his default cannot be overlooked under either the cause and prejudice or miscarriage of justice exceptions, this claim for habeas relief is barred.

#### b. Denial of Due Process and Right to Fair Trial Based on Prosecutorial Misconduct and Destruction of Evidence

Because this claim is barred, the Court declines to reach its merits.

## IV. CONCLUSION

Petitioner has met his burden of showing that, with respect to his juror misconduct and bias claim, the Court of Appeal's decision is contrary to clearly established law (and, if not, at least an unreasonable application of it). This is sufficient to grant his petition. Accordingly, the Court SETS ASIDE THE VERDICT and REMANDS FOR A NEW TRIAL.

**IT IS SO ORDERED.**

Dated: August 22, 2018

EDWARD J. DAVILA
United States District Judge